IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHIINGTON, | ) | |
| | ) | No.  36250-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DOUGLAS VIRGIL ARBOGAST, | ) | OPINION PUBLISHED IN PART |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Douglas Arbogast was convicted of attempted child rape after responding to an ad placed by a Washington State Patrol (WSP) task force sting operation.  The State persuaded the trial court that Mr. Arbogast was not entitled to an entrapment instruction unless he presented evidence sufficient to permit a reasonable juror to find entrapment by a preponderance of the evidence, citing *State v. Trujillo*, 75 Wn. App. 913, 917, 883 P.2d 329 (1994).  It persuaded the court that Mr. Arbogast should not be allowed to present evidence of his law-abiding past or argue his lack of criminal predisposition unless he presented evidence sufficient to prove by a preponderance of the evidence that WSP officers used more than a "normal amount of persuasion" in their communications with him.

The procedure prevented Mr. Arbogast from presenting evidence and obtaining an entrapment instruction to which he was entitled.  In the published portion of this decision,

we reject *Trujillo*'s standard, hold that Mr. Arbogast was wrongly prevented from

presenting "lack of predisposition" evidence, reaffirm that a trial court's decision whether

to instruct on entrapment cannot be based solely on law enforcement's conduct to the

exclusion of the defendant's lack of predisposition, and reverse and remand for a new

trial.

In the unpublished portion of this decision, we reject Mr. Arbogast's contention

that all or some of the charges against him should be dismissed for outrageous

government conduct or proof of entrapment as a matter of law. Addressing his pro se

statement of additional grounds, we reject a claim of insufficient evidence and address

instructional and discovery issues likely to arise in a retrial.

FACTS AND PROCEDURAL BACKGROUND

In July 2017, members of the Washington State Patrol Missing and Exploited

Children Task Force undertook a "Net Nanny" sting operation in the Tri-Cities by

placing ads in the now-defunct "Casual Encounters" section of Craigslist.[1] A member of

the task force would later describe the Casual Encounters section as "designed for no-

strings-attached sex." Report of Proceedings (RP)[2] at 881-82. "Quite a few" different

---

[1] As testified to at trial, Craigslist took down its personal ads in response to federal legislation. *See* H.R. 1865, the Allow States and Victims to Fight Online Sex Trafficking Act of 2017, which became Public Law No. 115-164, 132 Stat. 1253, on April 11, 2018. *And see* https://www.craigslist.org/about/FOSTA [https://perma.cc/KVQ2-7XTE].

[2] Unless otherwise indicated, RP references are to the report of proceedings that begins with proceedings on August 2, 2017, and includes most of the trial proceedings.

ads were placed by the WSP during the Tri-Cities sting operation, including ads from fictional children (female and male) who were themselves looking for sex.  RP at 976.

The ad involved in this case was placed by an adult, however: a fictional mother. The ad was reached if a Casual Encounters user clicked a "w4m" (woman for men) hyperlink.  It read:

> Mommy loves to watch family fun time.  Looking for that special someone to play with.  100%.  I know this is a long shot but I have been looking for this for a long item [sic] and haven't had any luck  looking for something real and taboo.  If this is still up then I am still looking.  send me your name and your favorite color so I know you are not a bot.  i like to watch ddlg daddy/dau, mommy/dau, mommy/son.

Ex. 1.

Sergeant Carlos Rodriguez, who planned the logistics for the Tri-Cities sting and wrote the "mommy" ad, acknowledged at the trial below that the ad was cryptic and might not be recognized as advertising sex with children, explaining that a more overt advertisement would be removed immediately by Craigslist.  He testified that terms in the ad (taboo, ddlg, daddy/dau, mommy/dau, mommy/son) had connotations for child predators whose meaning he learned through his training for and experience in sting operations.  He agreed that the task force received responses to the "mommy" ad from people who were not looking to have sex with children.

Then-70-year-old Douglas Arbogast e-mailed a response to the ad with his name and favorite colors, "Doug and black&white" at 1:56 p.m. on July 5.  Ex. 2.  He would

3

later testify that after discovering the Casual Encounters section of Craigslist a couple of years earlier, he had responded to a half dozen "woman for man" ads because sex had become painful for his wife of 48 years after her hysterectomy. Responding to such ads paid off once, a couple of months earlier, when he responded to a woman who said she wanted to "meet a man and become his whore for the night." RP at 1356. He met the 50-year-old woman at a local motel for sex.

On receipt of Mr. Arbogast's response to "mommy's" ad by the task force, it was passed on to WSP Detective John Garden, who undertook the sham communication that followed. Mr. Arbogast was pleased when, in the late afternoon, he saw a reply he had received some time earlier to the "mommy" ad:

> hi doug [smiley face emoji]  I am brandi . . . are u a
> black and white kind of guy?                                          4:14 PM

Ex. 2. He responded at 5:27 p.m.:

> Yes I am.  If guessed photography that is why . . . I
> do B&W Picts  So I up for anything if you are          5:27 PM

*Id.* Brandi quickly replied:

> Let's talk and see if you are interested in my
> situation.  would u mind texting me your name
> DOUG to 5096202098 so I know its u . . . . i really
> would rather text than email.                                     5:29 PM

*Id.* (Misspellings, punctuation, and capitalization here and in communications hereafter are original.)

Mr. Arbogast responded:

Ok, give me a few to get back at you in text mode.         5:49 PM

*Id.* Mr. Arbogast exchanged his iPad for his phone and at 5:54 p.m. began

communicating with Brandi by text:

| 5:54:03 PM | . . . | . . . | Incoming | Hi. I'm Doug. What's happening? |
|---|---|---|---|---|
| 6:00:46 PM | . . . | . . . | Outgoing | *thank u so much better to text* |
| 6:01:18 PM | . . . | . . . | Outgoing | *did you read my last email. i dont want to waste our time if this isnt for you. i really wnt to find the match* |
| 6:07:02 PM | . . . | . . . | Incoming | This really is me. I do B&W Picts if this helps |
| 6:08:22 PM | . . . | . . . | Outgoing | *ok are you good with my kids ages?* |
| 6:09:01 PM | . . . | . . . | Incoming | What are the ages |
| 6:11:09 PM | . . . | . . . | Outgoing | *thats why i asked if you read the last email i sent. . . . its in the email. boy is 13 and my precious baby girl is 11* |
| 6:12:58 PM | . . . | . . . | Incoming | OK sorry I missed it. All the replies on top of each other |
| 6:15:03 PM | . . . | . . . | Outgoing | *i get it…that is why I hate the emails i like texting for that reason* |
| 6:17:08 PM | . . . | . . . | Incoming | I agree. So tell me more about yourself |
| 6:33:02 PM | . . . | . . . | Outgoing | *i was rasied very close to my father. he started sleeping with me when i was young . . . at first i was scared but really enjoyued it. he was so gentle and loving. my mom knew so it made our home open. i miss those days. i want my kids to expereince the same closeness plus they need a techer to help them with sex when they get older* |
| 6:33:59 PM | . . . | . . . | Outgoing | *i have to be honest. i lost my attraction to men a while back. I cant get enough of young boys about my sons age./ their innosense is amazingly a turn on for me* |
| 6:46:54 PM | . . . | . . . | Incoming | Ok Brandi, I am probably a we bit older and know a few things. I can be easy and exploring into everything you might desire. So if you want to try someone older, game on. I d have most of my hair. |
| 6:57:37 PM | . . . | . . . | Incoming | So what would you like me to do to help? |

| | | | | *we had a very good man in my kids life for a year or so but lost him to a move becasue of military.  i am looking to fill his role in my kids lives.  he was bi and very gentle witht hem.  taught them oral and orther skills.  its so hard to find the right guy.  i have to be so careful and so do you.  i am not interested in men especailly older.  sorry my secrete is i am into boys my sons age . . . i love their innocense. can you be* |
|---|---|---|---|---|
| 7:02:57 PM | . . . | . . . | Outgoing | *the daddy my two kids need??* |

Ex. 3 (formatting modified).

At some point before Mr. Arbogast next texted "Brandi," he evidently found the

e-mail she sent him at 5:54 p.m.  Her e-mail had said:

> I need you to be honest about what you want, that is best and makes sure
> we all get what we want.  My girl is 11 and my boy is 13.  She is not totally
> active, but still likes to play and is very ready and mature.  My son is 13
> and very active.  I'm single and looking for some one who is open and free
> to new ideas.  If this fits you then lets talk and if it works out we can meet
> up and have some fun.

Ex. 2.

Twelve minutes after Brandi's "can you be the daddy my two kids need??" text,

Mr. Arbogast texted, "Well sorry to hear that.  I just read that missed mail.  Never have

done that.  I just wanted to be with mom.  Don't know if I could help do kids.  It's really

up to you." *Id.*  Brandi responded, "thanks for not wasting our time.  I am not looking for

me.  I am looking for someone to be with my kids.  Good luck with what it is you seek."

*Id.*  Mr. Arbogast replied, "I can be good with them.  Just never thought about it that

way." *Id.*

For the next hour and 40 minutes, the two texted in more detail about what Brandi wanted for her children, and whether Mr. Arbogast was willing to provide it. They exchanged photographs. This was Brandi's:



Ex. 5 (cropped and converted from color to greyscale).

At trial, the State pointed out that in the course of the texts, Brandi suggested that her children could engage Mr. Arbogast with kissing, touching, oral, and nonanal penetration (as long as it was not painful) and that Mr. Arbogast did not rule out any of the suggested conduct. Mr. Arbogast pointed out that he repeatedly said that he had not previously engaged in the conduct Brandi was suggesting.[3] The State pointed to several

---

[3] "Never have done that . . . Don't know if I could help do kids," "[N]ever thought about it that way," "I have not tried young kids," "Like I say. Never have done kids before," "I have a lot to learn as well," "Never done it before," and "Like I said I have not done this before." Ex. 3.

times when Brandi told Mr. Arbogast that she would not be involved—this was for her children. Mr. Arbogast claimed that he still believed that sex with Brandi was a possibility, pointing to the picture she sent, in which she appeared to him to be wearing a "teddy" (a type of lingerie) or bra; her response, after he offered her "TLC," that "i could get invloved with you and jake after a few good sessions of you two"; her enigmatic message, "change my mind about us hookiing [sic] up;" and her statement that he would need to "come to our place," and "when you come in we all get naked." Ex. 3.

At 9:00 p.m. Brandi texted, "when can we make this happen. the sooner the more it makes me less cautious its not a set up," adding a few minutes later, "we could do it tonight." Ex. 3. Once that was agreed, the following exchange occurred:

| | | | | |
|---|---|---|---|---|
| 9:11:56 PM | . . . | . . . | Outgoing | *what did you have in mind for play time tonight? what would u like* |
| 9:14:20 PM | . . . | . . . | Incoming | I'm easy for it. Just get to know one another. Are good with it. Send address |
| 9:16:32 PM | . . . | . . . | Outgoing | *can you stop and get condoms and lube. i dont want u to be unprepared if you need them. I have to prep the kids for what it is you want oral, hand job, penatration, kissing. we r night owls so time is good* |
| 9:19:42 PM | . . . | . . . | Incoming | Like I said have not done this before. Could do almost anything without penetration. |
| 9:21:40 PM | . . . | . . . | Outgoing | *are u interested in both anna and jake? same time or separate* |
| 9:22:34 PM | . . . | . . . | Incoming | Anna first |
| 9:23:10 PM | . . . | . . . | Incoming | I'm leaving now so send address |
| 9:23:23 | . . . | . . . | Outgoing | *ok separate is best. i will have to watch to make sure all is safe* |
| 9:25:09 PM | . . . | . . . | Incoming | K |
| 9:25:17 PM | . . . | . . . | Outgoing | *do you want to start with touching and move to oral or what. help me . . . . . . i want to tell anna. do you want her dressed in anything specific* |

| 9:26:18 PM | . . . | . . . | Incoming | Just under things touching then oral |
|---|---|---|---|---|
| 9:27:15 PM | . . . | . . . | Outgoing | *you giving or them giving oral or both??* |
| 9:28:14 PM | . . . | . . . | Incoming | Both |
| 9:29:12 PM | . . . | . . . | Incoming | Ok I'm driving.  Address please.  Can't look at same time |
| 9:29:33 PM | . . . | . . . | Outgoing | *ok . . . give me 10-15 minutes to prep them and shower anna.  I am excited you want to see them.  i hope this turns out to be what i am looking for.* |
| 9:29:56 PM | . . . | . . . | Incoming | Ok |
| 9:30:54 PM | . . . | . . . | Incoming | On the road |
| 9:41:22 PM | . . . | . . . | Outgoing | *what clothes  u didnt say to put them in. sorry hurrying* |
| 9:43:07 PM | . . . | . . . | Incoming | Under clothes is good |

Ex. 3 (formatting modified).

At 10:18 p.m., Mr. Arbogast arrived at the apartment whose address Brandi had provided.  Brandi, played by Detective Makayla Morgan, greeted him, invited him to take off his shoes, and left the room to "get the kids."  RP at 1195.  A team of officers then arrested him.  Mr. Arbogast did not have the condoms or lube that Brandi had asked him to pick up.

Mr. Arbogast waived his rights and agreed to speak with detectives.  He provided his passcode so that officers could search his phone.  He allowed officers to search his car.  During the interview, Mr. Arbogast said several times he had only come to the apartment to meet the mom and that he was not attracted to children, but he also admitted that he understood what Brandi had offered.  RP at 1280-81.  Mr. Arbogast said he was "BS-ing" with the mom and "going with the flow."  RP at 1285.

At the conclusion of the interview, Mr. Arbogast agreed to submit to a polygraph, and around midnight, the detectives interviewing him asked Detective John Davis, a

9

polygraph examiner with the Kennewick Police Department, to come to the undercover

location.  Detective Davis arrived shortly after 12:30 a.m.  He conducted a pretest

interview, part of which he recorded, before conducting a recorded polygraph test.  In a

report of the test results, he expressed his opinion that Mr. Arbogast showed no deception

when answering the following questions:

> Q.     Since becoming an adult, have you had sexual contact with anyone
> under the age of 16?
>
> A.     No.
>
> Q.     Have you had any sexual contact with anyone under the age of 16,
> since becoming an adult.
>
> A.     No.

Clerk's Papers (CP) at 12, 86.

A forensic download was taken of Mr. Arbogast's phone that the State

"thorough[ly] review[ed]" for evidence.  RP at 972.  No indication was found that Mr.

Arbogast was seeking sex with children when visiting Casual Encounters.[4]  The phone

was searched for child pornography.  None was found.  Other than the communications

Mr. Arbogast had with Detective Garden as "Brandi," there was nothing of evidentiary

value on the phone.  No evidence was recovered in the search of Mr. Arbogast's car.

---

[4] Sergeant Rodriguez testified that if Mr. Arbogast had responded to one of the ads from fictional children that was placed during the Tri-Cities sting operation, the response would have been given to an undercover officer, who would have engaged Mr. Arbogast in further conversation.  As far as he knew, that never happened.

Mr. Arbogast was charged with one count of attempted rape of a child in the first degree for traveling to the undercover location with the intent to engage in sexual intercourse with the fictional 11-year-old Anna, and one count of attempted rape of a child in the second degree for traveling to the undercover location with the intent to engage in sexual intercourse with the fictional 13-year-old Jake.

Early in the case, the defense moved to admit the results of the polygraph examination and to call Detective Davis as an expert witness, arguing that the results of the polygraph test were relevant to Mr. Arbogast's entrapment defense. In the alternative, the defense moved the court to admit the polygraph for the limited purpose of determining whether Mr. Arbogast was entitled to an entrapment instruction. The motions were denied. The State was unwilling to stipulate to the admissibility of the polygraph report and the trial court concluded that absent a stipulation, it lacked the authority to admit the results for any purpose.

Mr. Arbogast later moved to compel discovery of e-mails and texts the Net Nanny operation exchanged with other targets. He wanted to see if they bore out his belief that the cryptic nature of the Casual Encounters ad was misleading to others and that Detective Garden engaged in particularly entrapping behavior and excessive conversation-leading with him. The court denied the motion on the basis that what other

officers did in chatting with other targets was not relevant to Mr. Arbogast's entrapment

defense.

The State's pretrial motions in limine asked the court to prohibit any mention that

Mr. Arbogast had no prior criminal convictions or arrests, arguing that his lack of

criminal history was irrelevant and was character evidence that was not pertinent to the

charge of attempted rape of a child. Defense counsel argued that the evidence was

relevant to the defense of entrapment—specifically, Mr. Arbogast's lack of predisposition

to attempt child rape.

In arguing the motion, the State admitted that case law from other jurisdictions

recognizes that when a defendant asserts entrapment, the State can present evidence of

the defendant's prior criminal conduct to prove that he *does* have a criminal

predisposition.[5] The State's own trial brief cited cases holding that "any prior criminal

record" is evidence of predisposition. RP at 75. The prosecutor argued, however, that

such case law speaks of a "prior criminal record. It doesn't talk about a lack of it." *Id.*

The State argued that in any event, Mr. Arbogast's contention that he should be

able to offer evidence of his crime-free past was premature and before Mr. Arbogast

could obtain an entrapment instruction, "he has to be willing to admit the crime that

constitutes the crime charged, which is attempted rape of a child." RP at 59. Defense

---

[5] In oral argument, the prosecutor cited *United States v. Perez-Leon*, 757 F.2d 866, 871 (7th Cir. 1985) and *United States v. Kaminski*, 703 F.2d 1004 (7th Cir. 1983).

counsel disagreed, arguing that it was "enough that the defendant admit acts which if proved would constitute the crime." RP at 61.

The trial court granted the State's in limine motion provisionally, prohibiting the defense from presenting evidence that Mr. Arbogast had no prior convictions or arrests until such time as he had presented enough evidence of the luring, inducing aspect of entrapment to be entitled to the instruction.

The State's trial witnesses in its case-in-chief were five WSP officers who participated in the sting operation. A videotape of Mr. Arbogast's interview following his arrest was played for jurors. At the conclusion of the State's evidence, the prosecutor asked the trial court to rule whether Mr. Arbogast was entitled to present "lack of predisposition" evidence in the defense case in support of an entrapment instruction. The State argued Mr. Arbogast had not proved by a preponderance of the evidence that the government engaged in "anything more than normal salesmanship, which is allowed." RP at 1324-25.

Given the trial court's ruling that Mr. Arbogast could not argue lack of predisposition or obtain an entrapment instruction without first proving law enforcement's luring or inducement, the defense pointed among other evidence to the placement of a "woman for men" ad; the fact that the ad did not offer sex with children; Detective Garden's violation of standards on which he had been trained for chatting with

targets;[6] the picture Brandi sent, in which she appeared to be wearing a "teddy" or bra;[7] her statement that she "could get invloved [sic] with you and jake after a few good sessions of you two;" her enigmatic message, "change my mind about us hookiing [sic] up;" and her statement that Mr. Arbogast would need to "come to our place," and "when you come in we all get naked." Ex. 3.

In ruling, the trial court identified the issue as "whether or not the officer applied more than the normal amount of persuasion to induce the defendant to come to engage in the behavior." RP at 1332. It concluded there was not sufficient evidence of "more than the normal amount of persuasion." RP at 1333. On that basis, it refused to instruct on entrapment and did not allow evidence "regarding whether or not the defendant had engaged in this type of behavior previously to show a lack of predisposition." RP at 1334.

The only witness called by the defense was Mr. Arbogast. He testified he did not like the idea of adults having sex with children, had not been looking for that when he answered Brandi's ad, and had gone along when she disclosed what she was looking for to "get on her good side"—because he believed there was a possibility of having sex with

---

[6] The WSP task force is part of the United States Department of Justice's Internet Crimes Against Children (ICAC) Task Force Program. ICAC's Operational and Investigative Standards for task forces include generally "allow[ing] the investigative target to set the tone, pace, and subject matter of the online conversation." RP at 968 (quoting Ex. 16, at 13).

[7] Detective Morgan testified it was a tank top.

14

her.  RP at 1365.  He testified that he did not intend to have sex with Anna or Jake when he went to the apartment.

In rebuttal, the State called Detective Davis to testify that during the unrecorded part of his pretest interview, Detective Davis asked Mr. Arbogast if his intent, before he arrived was "to be with the children," to which Mr. Arbogast answered yes.  RP at 1446. In cross-examination, he affirmed that he did not ask Mr. Arbogast if he intended "to have sex with the children," but instead, whether he intended "to be with" them.  RP at 1451.

The jury found Mr. Arbogast guilty of both charges.  He appeals.

ANALYSIS

We begin with the issues that compel our decision to reverse Mr. Arbogast's convictions for instructional error.  Other assignments of error are addressed in the unpublished portion of the opinion.

The State's defense of the trial court's refusal to instruct on entrapment presents four issues that we address in the following order: (1) the State's argument that Mr. Arbogast was not entitled to the instruction because he denied intending to have sex with children, (2) the validity of *Trujillo*'s heightened, evidence-weighing standard for determining whether to instruct on entrapment, (3) the in limine ruling preventing Mr.

15

Arbogast from presenting evidence of his lack of criminal predisposition, and (4) whether

Mr. Arbogast's evidence was sufficient to entitle him to instruction.

We begin with an introduction of Washington's law of entrapment and the

standard by which we review a trial court's refusal to instruct on an affirmative defense.

I.      LAW OF ENTRAPMENT AND STANDARD OF REVIEW

Washington courts have "long recognized" the existence of the common law

defense of entrapment.  *State v. Lively*, 130 Wn.2d 1, 9, 921 P.2d 1035 (1996).  In 1975,

the legislature codified the common law definition of entrapment.  *Id.*  RCW 9A.16.070

provides:

> (1) In any prosecution for a crime, it is a defense that:
>
> > (a) The criminal design originated in the mind of law enforcement officials, or any person acting under their direction, and
> >
> > (b) The actor was lured or induced to commit a crime which the actor had not otherwise intended to commit.
> >
> > (2) The defense of entrapment is not established by a showing only that law enforcement officials merely afforded the actor an opportunity to commit a crime.

The statute restates the subjective test of entrapment applied by federal and

Washington state courts, which focuses on the issue of whether the defendant was

predisposed to commit the crime rather than on the conduct of the State to induce or

entice the defendant.  *Lively*, 130 Wn.2d at 10 & n.2 (citing *Sorrells v. United States*, 287

U.S. 435, 451, 53 S. Ct. 210, 77 L. Ed. 413 (1932) and *State v. Waggoner*, 80 Wn.2d 7, 10, 490 P.2d 1308 (1971).

The Washington Supreme Court has held that RCW 9A.16.070(1)(b) requires proof that the defendant "'was tricked or induced into committing the crime by acts of trickery by law enforcement agents,'" and "'[s]econd, . . . that he would not otherwise have committed the crime.'" *Lively*, 130 Wn.2d at 10 (quoting *State v. Smith*, 101 Wn.2d 36, 43, 677 P.2d 100 (1984)). In *Lively*, the Supreme Court addressed whether the burden of proof on a defense of entrapment should rest with the State or the defendant. It observed that under federal common law and the law of many states applying the subjective standard for entrapment the burden of persuasion is on the government to disprove entrapment beyond a reasonable doubt. 130 Wn.2d at 12-13 & n.3. In deciding that a Washington defendant would bear the burden instead, it reasoned that like other affirmative defenses that are uniquely within the defendant's knowledge and ability to establish, the predisposition of the defendant to commit the crime "is the focal element of the defense." *Id.* at 13.

A party is entitled to have the jury instructed on its theory of the case if there is evidence to support it. *State v. Fisher*, 185 Wn.2d 836, 848, 374 P.3d 1185 (2016). "'The trial court is justified in denying a request for [an affirmative defense] instruction only where no credible evidence appears in the record to support [it].'" *Id.* at 849

(alterations in original) (quoting *State v. McCullum*, 98 Wn.2d 484, 488, 656 P.2d 1064 (1983) (plurality opinion)).  In evaluating a defendant's evidence in support of an affirmative defense, the trial court must view it in the light most favorable to him.  *Id.* (citing *State v. Fernandez-Medina*, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000)).  Failure to give instruction on an affirmative defense to which the defendant is entitled is reversible error.  *Id.*

We review de novo a trial court's refusal to give a requested jury instruction when the refusal is based on a ruling of law.  *State v. Ponce*, 166 Wn. App. 409, 416, 269 P.3d 408 (2012).  We review a trial court's factual determination of whether a jury instruction should be given for an abuse of discretion.  *State v. Condon*, 182 Wn.2d 307, 315-16, 343 P.3d 357 (2015).

II.     MR. ARBOGAST COULD CHALLENGE CRIMINAL INTENT AND AT THE SAME TIME ASSERT THE DEFENSE OF ENTRAPMENT

The State argued below that by denying he intended to have sexual intercourse with Anna and Jake, Mr. Arbogast could not assert the defense of entrapment because "[e]ntrapment only applies if the defendant committed a crime."  Br. of Resp't at 17 (citing RCW 9A.16.070(1)(b)).  The trial court implicitly rejected the argument, but the State renews it on appeal.

The State's argument was rejected by this court in *State v. Galisia*, 63 Wn. App. 833, 837, 822 P.2d 303 (1992), *abrogated on other grounds by Trujillo*, 75 Wn. App. at

917. In *Galisia*, the court explained that while a defendant cannot deny that the actions on which a criminal charge even happened while at the same time asserting entrapment, it is a different matter when a defendant admits his actions but denies criminal liability:

> [*State v.*] *Matson*[, 22 Wn. App. 114, 587 P.2d 540 (1978)] and [*State v.*] *Draper*[, 10 Wn. App. 802, 806, 521 P.2d 53 (1974)] thus do not require a defendant to admit either the crime itself or all the elements of a crime before being entitled to an entrapment instruction. It is enough that a defendant admit acts which, if proved, would constitute the crime.

*Galisia*, 63 Wn. App. at 837.

*Galisia* was cited with approval on this point by the Washington Supreme Court in *State v. Frost*, 160 Wn.2d 765, 776 n.4, 161 P.3d 361 (2007). *Frost* held that the defendant's rights under the Sixth Amendment to the United States Constitution as well as his due process rights were violated when the trial court told defense counsel that if he argued that the State's evidence failed to establish the defendant's accomplice liability, the court would not give the defendant's requested instruction on duress. *Id.* at 776-79. The defendant forwent challenging the State's evidence to ensure that the duress instruction would be given.

*Frost* was unanimous in finding that the court erred in limiting the defendant from challenging the State's proof while at the same time asserting duress. While a 5-4 decision, the justices only disagreed about whether the trial court's error was harmless (the majority view) or structural error (the dissent's view).

19

III.    THERE IS NO VALID LEGAL BASIS FOR *TRUJILLO*'S HEIGHTENED, EVIDENCE-
        WEIGHING STANDARD FOR DETERMINING WHETHER TO INSTRUCT ON ENTRAPMENT

In *Trujillo*, the court rejected the usual "some" or "substantial" evidence standard

for obtaining instruction on an affirmative defense when it comes to entrapment.  It

announced a heightened standard, holding that "to entitle a defendant to an entrapment

instruction . . . a defendant must present evidence which would be sufficient to permit a

reasonable juror to conclude that the defendant has established the defense of entrapment

by a preponderance of the evidence."  75 Wn. App. at 917 (declaring the contrary holding

in *Galisia*, 63 Wn. App. at 836, to be "overly broad" and "improper[ ]").  *Trujillo*'s

holding on this heightened standard for instruction has been relied on without

examination in over a dozen unpublished Court of Appeals decisions, including an

opinion from this division in which this author was a member of the panel.[8]  It has not

been cited by the Supreme Court.  Mr. Arbogast is the first to challenge the standard as

erroneous, and we now agree that it does not withstand examination.[9]

---

[8] The standard was also discussed in the published opinion in *State v. Buford*, 93
Wn. App. 149, 152-53, 967 P.2d 548 (1998), in which the court held that since the
defense of unwitting possession, like entrapment, admits the crime but seeks to excuse
the conduct, the *Trujillo* standard should apply to unwitting possession.  Whether
*Trujillo*'s instructional standard was legitimately applied when the defense was
entrapment was not challenged or reexamined.

[9] The dissent begins with a vigorous defense of a "more than a scintilla of
evidence" standard that has long been required to carry a case to a Washington jury.  *E.g.*,
*Knight v. Trogdon Truck Co.*, 191 Wash. 646, 653, 71 P.2d 1003 (1937).  The "more than
a scintilla of evidence" standard is not challenged by Mr. Arbogast.  That well settled
standard was not the standard used by the trial court and is not questioned by us.  The

In adopting the heightened standard, the *Trujillo* court cited *State v. Riker*, 123

Wn.2d 351, 869 P.2d 43 (1994) and another Division One decision in *State v. Chapin*,

75 Wn. App. 460, 879 P.2d 300 (1994). 75 Wn. App. at 917.

In *Riker*, the Supreme Court rejected a defendant's argument that while she had

the burden of proving the defense of duress, it was only to the extent of creating a

reasonable doubt in the minds of the jurors as to her guilt—a lower standard than

preponderance of the evidence. 123 Wn.2d at 366. Clarifying the court's decision in

*State v. Bromley*, 72 Wn.2d 150, 155, 432 P.2d 568 (1967), *Riker* held that because

duress does not negate an element of the offense but pardons the conduct for a different

reason, the defendant was required to prove duress by a preponderance of the evidence.

*Id.* at 366-69.

In *Chapin*, the court applied *Riker*'s reasoning in rejecting a defendant's argument

that to defend on the basis of entrapment, he was only required to produce sufficient

evidence to create a reasonable doubt as to his guilt. 75 Wn. App. at 471.

In both *Riker* and *Chapin*, what was at issue was the burden of proof at trial. The

juries in both cases had been instructed on the relevant affirmative defense, so the

standard for obtaining an instruction on the defense was never at issue. *Riker*, 123 Wn.2d

at 358 (prosecutor had no objection to instructing on duress); *Chapin*, 75 Wn. App. at 470

---

problem is *Trujillo*'s holding that the standard to be applied *before the trial court
instructs on entrapment* is the preponderance of the evidence standard rather than a prima
facie evidence standard.

("Chapin requested and received an entrapment instruction."). Later decisions recognize that where the burden of proving an affirmative defense is by a preponderance of the evidence, the standard for *obtaining instruction* is still that "there is evidence to support [the defense] theory." *State v. Harvill*, 169 Wn.2d 254, 259, 234 P.3d 1166 (2010) (defense of duress).

The obvious problem with *Trujillo*'s standard is that it tasks the trial court with evidence-weighing that is the province of the jury. Rather than evaluate whether prima facie evidence of an affirmative defense has been presented, *Trujillo* holds that the court examines all the evidence and determines whether evidence supporting the defense would preponderate for a rational juror. *Trujillo*'s standard does not even require the court to view the evidence in the light most favorable to the defendant. Nothing in *Riker* or *Chapin* provides support for this heightened standard.

We agree with Mr. Arbogast that the heighted standard violates due process and his right to trial by jury. Only a jury can decide whether a defendant has met his burden of proving an affirmative defense by a preponderance of the evidence. U.S. CONST., amend. VI, XIV; WASH. CONST. art. I, §§ 3, 21. "At its core, the right of trial by jury guarantees litigants the right to have a jury resolve questions of disputed material facts." *Davis v. Cox*, 183 Wn.2d 269, 289, 351 P.3d 862 (2015) (declaring unconstitutional

22

threshold evidence weighing in Anti-SLAPP[10] suits), *abrogated on other grounds by*

*Maytown Sand & Gravel, LLC v. Thurston County*, 191 Wn.2d 392, 423 P.3d 223 (2018).

To preserve the right to a jury's determination, the burden of production is a

matter-of-law standard. As Mr. Arbogast points out, the State is required to prove every

element of a criminal charge beyond a reasonable doubt, but it can survive a *Knapstad*

motion to dismiss and proceed with prosecution as long as it produces prima facie

evidence of the elements. *State v. Knapstad*, 107 Wn.2d 346, 356-57, 729 P.2d 48

(1986). A civil litigant can survive a motion for summary judgment by presenting a

prima facie case. *Cornwell v. Microsoft Corp.*, 192 Wn.2d 403, 410-13, 430 P.3d 229

(2018).

We agree with Mr. Arbogast that due process and the right to a jury trial can

require no more for a criminal defendant to present an entrapment defense to the jury. He

was entitled to instruction on entrapment by presenting prima facie evidence of the

defense. *Trujillo*'s heightened standard for obtaining instruction on entrapment is legally

insupportable and we reject it.

IV.    IT WAS ERROR TO LIMIT MR. ARBOGAST'S EVIDENCE OF LACK OF PREDISPOSITION

The State persuaded the trial court that Mr. Arbogast should not be allowed to

present evidence that in his 70-year life he had not been suspected of, arrested for, or

convicted of crime. The State argued that such evidence was inadmissible character

---

[10] Strategic Lawsuits Against Public Participation, RCW 4.24.510.

evidence under ER 404.  In a more typical prosecution, this would be true.  But this

prosecution was the result of a sting operation.  It was and remains undisputed that "[t]he

criminal design originated in the mind of law enforcement officials, or any person acting

under their direction" within the meaning of the statutory defense.  RCW

9A.16.070(1)(a).  Entrapment was a possible defense, and once it was asserted, evidence

that Mr. Arbogast had no criminal history, and particularly no history of child predation,

was evidence of a pertinent trait of character: that he lacked a predisposition to commit

child rape.

Case law under the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW,

is relevant.  Under the SRA, a defendant's lack of "apparent predisposition" to commit a

crime in which he was induced to participate by others is a mitigating circumstance for

purposes of exceptional sentencing.  RCW 9.94A.535(1)(d).  When it comes to evidence

supporting the lack of an "apparent predisposition," our Supreme Court recognizes the

lack of criminal history as not only relevant, but as a paradigm.  *State v. Nelson*, 108

Wn.2d 491, 496-98, 740 P.2d 835 (1987) (The existence of a motive "does not establish

criminal disposition, [which is] measured under the SRA by a history of prior

convictions."); *State v. Freitag*, 127 Wn.2d 141, 149, 896 P.2d 1254 (1995) ("The Court

of Appeals . . . properly recognized that lack of criminal history does tend to show lack of

a predisposition to commit the crime.").  In reviewing whether the defendant in *Lively*

established entrapment as a matter of law, the Supreme Court viewed as relevant the fact that she had no criminal record or prior involvement in the offense charged. 130 Wn.2d at 18.

Evidence that Mr. Arbogast had not been suspected of, arrested for, or convicted of crime was admissible under ER 404(a)(1). Mr. Arbogast might not ultimately demonstrate entitlement to an entrapment instruction, but he was entitled to try. The State provides no authority or reasoned argument why defense counsel was required to proceed through voir dire, opening statement, and most of the trial with one hand figuratively tied behind his back, with the court only later deciding whether, thus hindered, he had nonetheless presented enough evidence to warrant instruction on entrapment.

V.      SUFFICIENT EVIDENCE SUPPORTED GIVING AN ENTRAPMENT INSTRUCTION

A. The trial court erred in considering only whether the undercover officer used more than the "normal amount of persuasion."

"Both by statute and court decision, the entrapment defense focuses on 'the intent or predisposition of the defendant to commit the crime.'" *Smith*, 101 Wn.2d at 42 (quoting *Hampton v. United States*, 425 U.S. 484, 488, 96 S. Ct. 1646, 48 L. Ed. 2d 113 (1976)); *accord Lively*, 130 Wn.2d at 13 (The predisposition of the defendant to commit the crime "is the focal element of the defense."). Indeed, our Supreme Court imposed the burden of proof on the defendant for the reason that "[t]he defendant has the knowledge

25

and ability to establish whether he or she was predisposed to commit the crime; whether he or she was lured or induced to do so by the State; and whether the criminal design originated in the mind of the police or an informant." *Lively*, 130 Wn.2d at 13. To determine whether evidence supports giving an instruction, a court should consider the defendant's testimony and the inferences that can be drawn from it. *Galisia*, 63 Wn. App. at 836. Despite this, in deciding that Mr. Arbogast did not present sufficient evidence to be entitled to an entrapment instruction, the trial court considered only one type of evidence: "whether or not the officer applied more than the normal amount of persuasion to induce the defendant to come to engage in the behavior." RP at 1332.

The legislature explicitly provided that "[t]he defense of entrapment is not established by a showing only that law enforcement officials merely afforded the actor an opportunity to commit a crime." RCW 9A.16.070(2). It did not otherwise limit the manner in which a defendant might be "lured or induced" to commit a crime he had not otherwise intended to commit. RCW 9A.16.070(1)(a).

A distinguished commentator on Washington criminal law has observed that "[m]any kinds of evidence can be used to prove predisposition." 13B SETH A. FINE, WASHINGTON PRACTICE: CRIMINAL LAW & SENTENCING § 38:3, at 411 (3d ed. 2019). Examples identified are "ready compliance with an illegal request, previous commission of the same crime, acts showing eagerness to commit the crime, substantial effort in

investigating and arranging an illegal transaction, and familiarity with the practices of an

illegal trade." *Id.* (footnotes omitted). Logic dictates that contrary evidence can be used

to prove a lack of predisposition. An additional kind of evidence recognized as relevant

in *Lively* is the fact that the defendant was not the target of any criminal investigation

until the law enforcement activity that made her a suspect. 130 Wn.2d at 18.[11]

In *Smith* and *Lively*, the Supreme Court characterized entrapment as encompassing

two elements: that the defendant "was tricked or induced into committing the crime by

acts of trickery by law enforcement agents," and "[s]econd, . . . that he would not

otherwise have committed the crime." *Lively*, 130 Wn.2d at 10 (quoting *Smith*, 101

Wn.2d at 43). While characterized as two elements, however, our Supreme Court has

treated them as two sides of the same coin. In *Smith*, for instance, the Supreme Court

characterized itself as focusing on the inducement element, but in a case where the

defendant's only evidence of his lack of predisposition to sell drugs was that he

succumbed to a deceptive sympathetic appeal: a customer seeking marijuana who was

---

[11] *Perez-Leon* and *Kaminski*, the cases the State argued would allow it to offer evidence of a defendant's criminal history, include their own identification of factors relevant in determining the predisposition of a defendant. Relevant to the determination are: "(1) assessing the character or reputation of the defendant, including any prior criminal record; (2) whether the suggestion of criminal activity was made by the government; (3) whether the defendant was engaged in criminal activity for profit; (4) whether the defendant expressed reluctance to commit the offense which was overcome only by repeated government inducement or persuasion, and (5) the nature of the inducement or persuasion applied by the government." *Perez-Leon*, 757 F.2d at 871 (citing *Kaminski*, 703 F.2d at 1008).

dying.  In analyzing the inducement element, the court necessarily considered the defendant's evidence; it did not ignore it.

Here, the trial court too narrowly considered only police conduct, when the focal point of the defense was the defendant's lack of predisposition.

In arguing to the trial court that Mr. Arbogast was presented with no more than the "normal amount of persuasion," the State argued conclusorily, never identifying what made Brandi's communications with Mr. Arbogast "normal" persuasion.  A trial court should not accept at face value the State's contention that its persuasion was of the "normal amount."  The State never demonstrated or explained how its communications with Mr. Arbogast were nothing more than "normal."

B.      Mr. Arbogast was entitled to the instruction

Mr. Arbogast testified that he had never had sex with children or any interest in sex with children.  There was no dispute that before responding to Brandi's ad, he had not been convicted of, charged with, or even suspected of a sex crime against a child.  He responded to what was posted as a "woman for man" ad that Sergeant Rodriguez admitted was cryptic, might not be recognized as advertising sex with children, and in fact had not been recognized by other responders as advertising sex with children.

Once Mr. Arbogast recognized what was being offered, his immediate response was "Never have done that. . . . Don't know if I could help do kids."  Ex. 3.  He retreated

from that position when Brandi made clear that engaging in sex with her children was required to get together with her, but he repeatedly stated he had never engaged in such conduct with children before. Detective Garden could have refrained from *any* suggestion that Brandi's participation was a possibility, but he did not. When Mr. Arbogast arrived at the undercover location, he had not stopped to pick up lube or condoms as Brandi had requested. No incriminating evidence was found on his phone or in his car.

A final aspect of the inducement that has been found relevant by federal courts is that Brandi was not prostituting her fictional children, but presented as a loving mother who sought to provide something she had benefitted from as a child. She made clear that whatever Mr. Arbogast did with her precious children would only be under her protective oversight and rules. As explained in *United States v. Poehlman*, a case involving a similarly-premised sting:

> Throughout the correspondence with Poehlman, Sharon made it clear that she had made a firm decision about her children's sexual education, and that she believed that having Poehlman serve as their sexual mentor would be in their best interest. She made repeated references to her own sexual mentor, explaining that he could have mentored her daughters, had he not died in a car crash in 1985. While parental consent is not a defense to statutory rape, it nevertheless can have an effect on the "self-struggle [to] resist ordinary temptations." *Sherman* [*v. United States*], 356 U.S. [369,] 384, 78 S. Ct. 819[, 2 L. Ed. 2d 848 (1958)] (Frankfurter, J., concurring). This is particularly so where the parent does not merely consent but casts the activity as an act of parental responsibility and the selection of a sexual mentor as an expression of friendship and confidence. Not only did this diminish the risk of detection, it also allayed fears defendant might have

had that the activities would be harmful, distasteful or inappropriate, particularly since Sharon claimed to have herself benefitted from such experiences.

217 F.3d 692, 702 (9th Cir. 2000) (first alteration in original) (citation to record omitted).

The same conclusion was reached by the First Circuit Court of Appeals in *United States v. Gamache*, which also involved a "mother seeking mentor" premise that the court found to be improper inducement based in part on the story line:

[T]he government agent provided justifications for the illicit activity (intergenerational sex) by describing "herself" as glad that Gamache was "liberal" like her, expressing that she, as the mother of the children, strongly approved of the illegal activity, and explaining that she had engaged in this conduct as a child and found it beneficial to her. These solicitations suggested that Gamache ought to be allowed to engage in the illicit activity, just as the Government in *Jacobson*[ *v. United States*, 503 U.S. 540, 112 S. Ct. 1535, 118 L. Ed. 2d 174 (1992)] used a fake lobbying organization to appeal to anti-censorship motives.

156 F.3d 1, 11 (1st Cir. 1998).

As previously noted, the burden of proof is different in federal court, and in the unpublished portion of the decision, we deny Mr. Arbogast the remedy of reversal and dismissal that the defendants obtained in *Poehlman* and *Gamache*. But the relevance of the nature of the inducement is the same here.

The State has tended to defend the trial court's refusal to instruct on entrapment by pointing to the evidence that Mr. Arbogast intended to have sex with the children. It is a given for this issue that Mr. Arbogast committed attempted first and second degree child

30

rape.  The question is whether the jury might, if instructed, have found that he was lured

or induced to commit those crimes, which he had not otherwise intended to commit.  The

jury might make that finding on this evidence.  It was not given the opportunity.

We reverse the convictions and remand for further proceedings consistent with

this opinion.

A majority of the panel having determined that only the foregoing portion of this

opinion will be printed in the Washington Appellate Reports and that the remainder

having no precedential value shall be filed for public record pursuant to RCW 2.06.040, it

is so ordered.

VI.    REVERSAL WITH DIRECTIONS TO DISMISS THE CHARGES IS NOT WARRANTED ON
       THE BASIS OF OUTRAGEOUS GOVERNMENT CONDUCT OR PROOF OF THE
       ENTRAPMENT DEFENSE AS A MATTER OF LAW

Despite reversing and remanding, we need to address Mr. Arbogast's two other

assignments of error because they would, if established, entitle him to dismissal of the

charges.  We address them in the order presented.

A.     Mr. Arbogast does not demonstrate outrageous conduct requiring dismissal

A claim of outrageous government conduct "is founded on the principle that the

conduct of law enforcement officers and informants may be 'so outrageous that due

process principles would absolutely bar the government from invoking judicial processes

to obtain a conviction.'"  *Lively*, 130 Wn.2d at 19 (quoting *United States v. Russell*, 411

31

U.S. 423, 431-32, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973)).  "For the police conduct to

violate due process, the conduct must shock the universal sense of fairness."  *Id.*  Courts

evaluate the government's actions under the totality of circumstances.  *Id*. at 21.  *Lively*

identifies the following factors for determining whether police conduct was outrageous:

> [(1)] whether the police conduct instigated a crime or merely infiltrated ongoing criminal activity; [(2)] whether the defendant's reluctance to commit a crime was overcome by pleas of sympathy, promises of excessive profits, or persistent solicitation; [(3)] whether the government controls the criminal activity or simply allows for the criminal activity to occur; [(4)] whether the police motive was to prevent crime or protect the public; [(5)] whether the government conduct itself amounted to criminal activity or conduct "repugnant to a sense of justice."

*Lively*, 130 Wn.2d at 22 (citations omitted).  "Dismissal based on outrageous conduct is

reserved for only the most egregious circumstances.  'It is not to be invoked each time

the government acts deceptively.'"  *Id.* at 20 (quoting *United States v. Sneed*, 34 F.3d

1570, 1577 (10th Cir. 1994)).  Courts "focus on the State's behavior and not the

Defendant's predisposition."  *Id.* at 22.

As Sergeant Rodriguez testified, if someone responding to an ad placed by the task

force was not interested in children, "then we don't talk to them any longer."  RP at 896.

Detective Garden testified that consistent with his training, he would not continue to

pursue someone he was chatting with who was not interested in sex with a child, and

would instead respond with "'good luck' or 'bye,' 'not for you,' 'thanks for not wasting

my time,' whatever, something like that."  RP at 1024.  While Detective Garden did not

refrain from suggesting that Brandi's participation was a possibility in his texts with Mr.

Arbogast, he also made statements of this sort.[12]  While we have rejected the State's

argument that these statements of deflection were enough to disprove entrapment, they

are, under a "totality of circumstances" analysis, enough to defeat Mr. Arbogast's claim

of outrageous government conduct.

B.      Mr. Arbogast did not prove entrapment as a matter of law

Alternatively, Mr. Arbogast urges us that dismissal of the charges is required

because entrapment was proved as a matter of law.  He relies on federal cases, in which

entrapment is found as a matter of law if the government's evidence does not disprove

entrapment beyond a reasonable doubt.  Under Washington law, the appropriate standard

of review is whether, "considering the evidence in the light most favorable to the State, a

rational trier of fact could have found that the defendant failed to prove the defense by a

preponderance of the evidence." *Lively*, 130 Wn.2d at 17.

Viewing the evidence in the light most favorable to the State, we ignore Mr.

Arbogast's exculpatory statements when interviewed following his arrest and his

exculpatory trial testimony, all of which the jury might have rejected.  The jury never

heard that Mr. Arbogast had not previously been convicted, charged, or suspected of

---

[12] *E.g.*, "I am not looking for me.  I am looking for someone to be with my kids. good luck with what it is you seek," "do you have an attraction to children.  i am not looking for a friend," "i don't think you could satisfy my kids or that you want to sexually," "i cant force you to do this nor do i want to," "i have to be clear i am not involved."  Ex. 3.

sexual misconduct toward children. What is left is the evidence of the e-mail and text communications with Brandi. Had the jury been asked to address the defense of entrapment, a rational juror reviewing the evidence presented could have found that Mr. Arbogast failed to prove entrapment by a preponderance of the evidence.

## STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds (SAG), Mr. Arbogast raises four. One is a challenge to community custody conditions to which Mr. Arbogast did not object at sentencing. If convicted in a retrial, he will have the opportunity to object if the trial court considers imposing those conditions again, so we decline to address that issue. We address the remaining three.

*Instructional error*

The court instructed the jury: "A substantial step is conduct that strongly indicates *a* criminal purpose and that is more than mere preparation." CP at 157 (emphasis added). The defense proposed that the instruction read "A substantial step is conduct that strongly indicates *the* criminal purpose and that is more than mere preparation." CP at 137 (emphasis added). Similarly the court instructed the jury: "A person acts with intent or intentionally when acting with the objective or purpose to accomplish a result that constitutes a crime." CP at 161.

34

Mr. Arbogast argues that the instructions failed to consider that jurors might find

he had a criminal purpose, but not to commit child rape. He gives as examples a possible

criminal purpose to talk with the children (communication with a minor for immoral

purposes, RCW 9.68A.090) or to touch them (child molestation, RCW 9A.44.083, .086).

SAG at 4.

The trial court's "to convict" instructions specified that the intent and substantial

step must relate to the charged crime, however. For example, instruction 11, the "to

convict" instruction for the attempted first degree rape charge read in relevant part:

> To convict the defendant of the crime of attempted rape of a child in
> the first degree as charged in Count 1, each of the following elements of the
> crime must be proved beyond a reasonable doubt:
>
> (1) That on or about July 5, 2017, the defendant did an act that was a
> substantial step toward the commission of rape of a child in the first degree;
>
> (2) That the act was done with the intent to commit rape of a child in the
> first degree . . . .

CP at 158. Instruction 12, the "to convict" instruction for the attempted second degree

rape charge, was couched in similar terms.

"[W]e do not review the adequacy of jury instructions in isolation; we review the

jury instructions as a whole." *State v. Davis*, 174 Wn. App. 623, 638, 300 P.3d 465

(2013) (citing *State v. Prado*, 144 Wn. App. 227, 240, 181 P.3d 901 (2008)). Reading the

instructions as a whole, there is no danger the jury believed that Mr. Arbogast's

substantial step could be toward *any* crime, or with an intent to commit *any* crime. *See id.*

### *Evidence sufficiency to prove the attempted second degree rape of Jake*

Mr. Arbogast next argues there was insufficient evidence to support his conviction for the attempted second degree rape of Jake. There was less evidence of the attempted second degree rape of Jake than of the attempted first degree rape of Anna. Mr. Arbogast's text communications stated, "I do look at young girls, not so much boys." Ex. 3. Brandi expressed her own sexual attraction to her son, leading Mr. Arbogast to ask if he would "need to groom the boy alone." *Id.* Mr. Arbogast told Brandi he had "[n]ever done anal." Ex. 3 (CP at 79). Asked by Brandi if he was "interested in both anna and jake?" once they agreed to meet, he answered, "Anna first." *Id.* When it came to how to dress the children, Brandi initially texted only about what Mr. Arbogast wanted Anna to wear. *Id.*

Bearing in mind the State's burden in an attempt crime to prove a substantial step that is strongly corroborative of the actor's criminal purpose, we viewed a sufficiency challenge as a viable issue and requested a response from the State. Having reviewed its response, and considering all, we conclude that the evidence was sufficient given that we view the evidence and all reasonable inferences in the light most favorable to the State. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). After Mr. Arbogast began

36

driving to Brandi's apartment, some of Brandi's texts were ambiguous as to whether she expected Mr. Arbogast to engage in sex with both children. While Mr. Arbogast was driving, he continued to text and did not correct the ambiguity. It is not our role to reweigh the evidence and substitute our judgment for that of the trier of fact. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (plurality opinion).

*Discovery*

Finally, Mr. Arbogast argues the court erred when it denied his request for discovery of chat logs for other Net Nanny cases. He had argued that given case law holding that a defendant must prove the State used "more than normal" persuasion, evidence of what occurs in other Net Nanny chats could help prove entrapment. Since the trial court did not instruct on entrapment in the trial below, the State had no occasion to argue to the jury that undercover officers had used only the "normal amount of persuasion."

We do not hold that the trial court should have ordered the requested discovery in the trial below. But since the court will instruct the jury on entrapment in any future trial, it should revisit the discovery issue, at least for the purpose of determining whether the State intends to present evidence and argument that no more than the "normal amount of persuasion" was used, and what that evidence would be.

It is not clear from the record what the State contends "normally" persuades an

adult to rape a child. Seeking guidance from controlling cases, we went back to *State v.*

*Waggoner*, 80 Wn.2d at 10-11, the decision that initially identified the "normal amount of

persuasion" as relevant where entrapment is asserted as a defense. In *Waggoner*, the

defendant was charged with selling LSD[13] to a police informant. His only evidence of

entrapment was that for unexplained reasons he was initially reluctant to act on the

informant's expressed interest in purchasing large quantities of drugs. A couple of days

later, however, he called the informant and made the offer leading to a sale from which

he was to receive a commission. As explained by the *Waggoner* court, "[t]he record

itself reveals that the activities of individuals such as [the informant] have made

discretion and suspicion an operating principle for drug dealers in all of their sales." *Id.*

at 10.

Giving consideration to a "normal amount of persuasion" makes sense in a context

where there *is* a "normal amount" of persuasion for which evidence exists, such as the

wariness of drug sellers to sell to unfamiliar buyers. Our Supreme Court has applied the

concept only in connection with the sale of drugs. *See id. and see Smith*, 101 Wn.2d at

42-43 ("A police informant's use of 'a normal amount of persuasion to overcome' and

'expected resistance' to sell drugs 'does not constitute entrapment and will not justify an

entrapment instruction.'" (quoting *Waggoner*, 80 Wn.2d at 11)).

---

[13] Lysergic acid diethylamide.

No Washington decision has analyzed a "normal amount of persuasion" that induces adults to rape children. If the State intends to present evidence and argument that there *is* a normal amount of persuasion that causes an adult to attempt child rape, and if its evidence will be WSP witnesses testifying to their experience in prior sting operations, then obtaining relevant discovery might be needed for meaningful cross-examination. We leave it to the trial court to determine in light of the evidence the State proposes to offer what discovery, if any, should be permitted.

We reverse the convictions and remand for further proceedings consistent with this opinion.

_____
Siddoway, J.

I CONCUR:

_____
Lawrence-Berrey, J.

No. 36250-7-III

KORSMO, A.C.J. (Dissenting) — The majority errs in two significant ways. First, it attacks the wrong case and thereby conflicts with controlling Washington Supreme Court precedent concerning the sufficiency of the evidence to support an entrapment instruction. What the majority calls the "heightened" *Trujillo* standard is nothing more than the Washington Supreme Court's longstanding standard for any affirmative defense that excuses criminal conduct. Using the proper standard, the trial court correctly concluded that there was only "normal" persuasion rather than entrapping behavior. Second, the majority fails to recognize that the errors in excluding defendant's proposed evidence were harmless even if he had been entitled to an entrapment instruction. I will address those issues in the order listed.

*Sufficient Evidence Standard.* The majority faults the "heightened" standard supposedly applied by *State v. Trujillo*, 75 Wn. App. 913, 883 P.2d 329 (1994). However, *Trujillo* got that standard from *State v. Riker*, 123 Wn.2d 351, 869 P.2d 43 (1994), and *State v. Gray*, 69 Wn.2d 432, 418 P.2d 725 (1966). It is the standard consistently used in every appellate decision. As recognized by *Trujillo* and *State v. Chapin*, 75 Wn. App. 460, 879 P.2d 300 (1994), *Riker* did not change *Gray* and its progeny.

The majority confuses the evidence needed to support a general instruction and the evidence needed to support an instruction carrying a burden of proof. For instance, in a

criminal case, the court will not instruct the jury on the elements of a crime if the State

does not present evidence supporting each element of the crime. Likewise, if the

evidence does not establish the affirmative defense, no instruction will be given.[1]

In *Gray*, a police informant who was in trouble with federal authorities repeatedly

asked to purchase marijuana from Gray. 69 Wn.2d at 433. The two negotiated terms and

then drove to the defendant's home. He returned with plastic wrapped marijuana that he

turned over to the informant. *Id*. A second sale was arranged and consummated under

similar circumstances. *Id*. at 433-34. At trial, Gray admitted making the sales, but

contended that they were done to help out his friend, the informant, who was shunned by

most marijuana suppliers due to his legal troubles. *Id*. at 434. Appellant had never been

charged or convicted of narcotics offenses. *Id*.

The trial court declined to give an entrapment instruction or other instructions in

support of the defense theory. *Id*. The Supreme Court agreed that there was insufficient

evidence to support entrapment:

---

[1] For example, if slight evidence of intoxication is presented, the jury may be
instructed concerning the impact of intoxication on a defendant's ability to act with the
appropriate mental state. No party bears a burden of proof on that defense. In contrast,
an instruction on self-defense would require some evidence supporting each element of
the defense—a subjective understanding of the situation and an objective requirement to
act as a reasonably prudent person faced with those circumstances. *State v. Walden*, 131
Wn.2d 469, 474, 932 P.2d 1237 (1997). For instance, if the defendant reacted to a verbal
insult with deadly force, the court would not instruct on self-defense despite the
defendant's testimony that he acted in self-defense since a reasonable person would not
use deadly force in the absence of a threat of death or great personal injury. *Id*.

Even if we accept appellant's testimony that he told the officer and the informer he did not want to sell marijuana and was only persuaded through friendship and sympathy, we do not have more than the scintilla of evidence necessary for an instruction. We must also consider the undisputed testimony in this case. Appellant took the officer to his own home to get the marijuana. Appellant accepted money for the marijuana; most importantly appellant gave the officer his telephone number and told him to return any time. In light of this, appellant's original protests (if indeed they were ever made) were just his own manner of bargaining.

It is quite obvious that appellant was furnished nothing more than an opportunity to sell.

*Id*. at 435.

A different problem primarily was at issue in *State v. Galisia*, 63 Wn. App. 833, 822 P.2d 303 (1992). There the trial court declined to give an entrapment instruction in a case where an informant repeatedly asked the defendant, a man named Norgard, for help in obtaining cocaine. The defendant gave the informant his telephone number. *Id*. at 834. Three times the informant called and was told that the defendant could not help him. *Id*. at 834-35. Running into the informant in downtown Seattle five days later, Norgard steered him to another man and a deal was ultimately reached to purchase a large quantity of cocaine; Norgard was to get cash and cocaine for facilitating the transaction. *Id*. at 835. The trial judge declined to give an entrapment instruction because Norgard did not admit to delivering the cocaine. *Id*. at 836.

Division One of this court disagreed with that rationale, reasoning that a defendant need not admit his guilt before raising entrapment. The court distinguished between a

defendant admitting the actions which gave rise to the charges and admitting that criminal liability existed.[2]  *Id*. at 837.  A defendant need only do the former.  *Id*.  The court, nonetheless, affirmed the determination that Norgard was not entitled to an entrapment instruction, reasoning that Norgard had not presented sufficient evidence that he was lured to commit a crime that he did not otherwise intend.  *Id*.

In the beginning of its analysis, the *Galisia* court had stated that "a defendant need not present that quantity of evidence necessary to create a reasonable doubt in the minds of jurors to be entitled to an entrapment instruction."  *Id*. at 836.  That sentence was, at least initially, at issue in *Trujillo*.  That court recognized that *Galisia* had misstated the burden of proof in light of *Riker*:

> With respect to the quantum of proof necessary to entitle a defendant to an entrapment instruction, we hold that a defendant must present evidence which would be sufficient to permit a reasonable juror to conclude that the defendant has established the defense of entrapment by a preponderance of the evidence.  We recognize that in . . . [*Galisia*] the court held that a defendant need only produce "some evidence" to support an entrapment instruction.  We conclude that in light of . . . [*Riker*] and our discussion of the defendant's burden of proof on the entrapment defense in . . . [*Chapin*] this statement of the required quantum of proof is overly broad and improperly entitles a defendant to an entrapment instruction upon production of a mere scintilla of evidence.  A scintilla of evidence is not sufficient to justify an entrapment instruction.

*Trujillo*, 75 Wn. App. at 917 (footnote and citations omitted).  Judge Agid, the author of *Galisia*, was a member of the *Trujillo* panel.

---

[2] The same distinction subsequently was made by *State v. Frost*, 160 Wn.2d 765, 161 P.3d 361 (2007).

4

One issue in *Riker* involved the burden of proof when an affirmative defense of duress is raised. 123 Wn.2d at 366-69. The court concluded that any defense such as duress that excuses conduct must be established by the preponderance of the evidence. *Id*. at 368-69. Defenses that negate an element of the crime need only be established to the point where they raise a reasonable doubt. *Id*. at 368. In light of *Riker*, the *Trujillo* court understandably took the time to correct the misstatement in *Galisia* about the nature of the defendant's burden of proof to establish entrapment. He must establish the defense by a preponderance of the evidence.

The other issue in *Trujillo* was whether the defendant had produced enough evidence to justify an entrapment instruction. There the defendant, a man named Chrisostomo, was asked on multiple occasions by an informant pretending to be a fellow employee if he could sell him some cocaine.[3] 75 Wn. App. at 914-16. The defendant rebuffed his efforts repeatedly. *Id*. at 915-16. Asked to obtain information about a seller, the defendant later called an acquaintance to a tavern where the informant was drinking. The acquaintance sold Chrisostomo cocaine which he in turn sold to the informant. *Id*. at

---

[3] Similar is *State v. Waggoner*, 80 Wn.2d 7, 490 P.2d 7, 490 P.2d 1308 (1971). There an informant repeatedly asked, but was turned down, to obtain LSD from the defendant. The defendant later arranged, on a commission basis, for the informant to make the purchase from a different seller. *Id*. at 8. The court concluded that the evidence was insufficient to support an entrapment instruction since it showed the informant used "a normal amount of persuasion." *Id*. at 10-11.

916. Defendant later stated that he obtained the cocaine solely to get the informant to stop pestering him. *Id*.

Accepting the defendant's testimony as true, Division One concluded that it was insufficient to justify an entrapment instruction. *Id*. at 918. The amount of badgering did not amount to improper persuasion. *Id*. at 919. In the course of its analysis, *Trujillo* also noted its prior decision in *State v. Enriquez*, 45 Wn. App. 580, 725 P.2d 1384 (1986) (informant pointing out defendant could support his drug addiction by selling drugs not improper inducement). *Trujillo*, 75 Wn. App. at 918.

Also of interest is a decision discussed by the majority, *State v. Smith*, 101 Wn.2d 36, 677 P.2d 100 (1984). There an informant introduced an undercover officer to her friend as the informant's husband. The putative husband was dying and needed marijuana to ease his pain. *Id*. at 38. After initially declining to do so, the defendant sold the "husband" marijuana on three occasions. *Id*. This evidence was no more than a "normal" amount of persuasion and, thus, insufficient to establish that the defendant was induced to commit the crime. Entrapment was not established. *Id*. at 42-43.

This historical recital establishes that the trial court correctly concluded here that the evidence of inducement was insufficient to justify an entrapment instruction. Trial and appellate courts have always "weighed" the sufficiency of the evidence to support an affirmative defense instruction—if it is not legally sufficient to constitute inducement, no instruction is proper even if there is some evidence of an "inducement." *Id*. at 43. In

each and every one of the recited cases, the defense failed to produce sufficient evidence

to support the defense theory. In every one of those cases, including *Galisia*, the

appellate court found the evidence insufficient to support an entrapment instruction. The

majority's new standard is inconsistent with the case law.

Mr. Arbogast argues that the inducement was the possibility of a future sexual

encounter with "Brandi" if he first became a sexual mentor to her children. This

"inducement" should be rejected as a lawful justification for a sexual encounter with

children. However, even that alleged inducement does not suffice since, at least five

times by the majority's count, the detective texted that "Brandi" would not be sexually

involved with the defendant.[4] The alleged inducement was removed from this case long

before Mr. Arbogast got in his car to drive to Brandi's apartment.

To prove entrapment, a defendant must establish both that he was induced to

commit the crime and also that he was not predisposed to commit it. RCW 9A.16.070;

*Smith*, 101 Wn.2d at 42. In addition to showing the lack of predisposition, a defendant

must show the existence of an unfair or improper inducement.[5] *Smith*, 101 Wn.2d at 43.

It is this last proposition that sinks this appeal. "Normal" persuasion is simply the

---

[4] *See* majority at 27, fn.11 (citing Ex. 3).
[5] The example cited by *Smith* was *Sherman v. United States*, 356 U.S. 369, 78 S. Ct. 819, 2 L. Ed. 2d 848 (1958). In *Sherman*, the police informant had induced the defendant to return to drug usage, an action that amounted to entrapment. 101 Wn.2d at 43.

inducement used to obtain the defendant's participation in the scheme. In the above-noted cases, "normal" persuasion has included repeated requests (*i.e.*, not taking no for an answer) and appeals to sympathy. Only if there is something unlawful or improper about the inducement does it rise to the level of entrapping behavior. *Id.* Offering a future consensual sexual encounter did not amount to an improper inducement to commit a crime.

The trial court correctly concluded that Mr. Arbogast did not have any evidence of some improper inducement to commit the crime. The officers merely afforded him the opportunity to do so. He was not entitled to an entrapment instruction. There was no error.

*Harmlessness.* It is fundamentally inconsistent to say both "I didn't do it" and "the government made me do it." While taking inconsistent positions does not mean that a defendant is not entitled to a defense supported by the evidence, it does suggest that any error can be harmless. *State v. Frost*, 160 Wn.2d 765, 771, 161 P.3d 361 (2007). That is the situation here.

I agree that once he had testified to set a foundation for putting his reputation for sexual morality in question, Mr. Arbogast's evidence of lack of predisposition should

have been admitted at trial.[6]  As noted by the majority, there is a distinction between

admitting the actions and admitting liability for those actions.  *Id*. at 776.  The trial court

erred by excluding the evidence of lack of predisposition.

Nonetheless, this error was harmless for two distinct reasons.  First, as just

discussed, it was harmless because Mr. Arbogast did not bear his burden of proving an

unlawful inducement.  Second, even had he been entitled to an entrapment instruction,

the error was harmless because entrapment was a weaker defense that largely duplicated

his primary defense of lack of criminal intent.  Indeed, his own testimony that he was

present to meet the mother rather than the children undercut any claim that he was

entrapped to committing a crime.  Entrapment was an inferior defense and pursuing that

course would only have undercut Mr. Arbogast's credibility to the ruin of his primary

defense.  When credibility is critical, inconsistent defenses are a poor strategy.

The defense of lack of criminal intent was the appropriate approach for the jury

since it allowed Mr. Arbogast to show his apparent naivety before the jury to argue that

he was not a child abuser.  If the jury did not believe his primary story, as they apparently

did not, an entrapment argument would not have done him any good since his credibility

---

[6] Why anyone would want to put this type of evidence in front of a jury is a question I cannot answer.  A person who has a "reputation" has one because others have been talking about him in their community.  ER 608; *State v. Land*, 121 Wn.2d 494, 851 P.2d 678 (1993).  Every time I have seen this evidence admitted at trial, the result has been devastating cross-examination of the reputation witnesses concerning why they gossiped about another person's reputation for sexual morality.  Neither the witnesses nor the proponent came out looking very good.

was key to either defense.[7]  The exclusion of the entrapment theory was absolutely

harmless here.  *Frost*, 160 Wn.2d at 782-83.

     I respectfully dissent.

_____
                   Korsmo, A.C.J.

---

[7] If there is any good to come from this appeal, perhaps it will be in the parties finding new incentive to settle this case.