**FILED**
**AUGUST 17, 2023**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 38872-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM P. MCBRIDE, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J.P.T.* — William McBride appeals his conviction for possession of a controlled substance (methamphetamine) with intent to deliver. Mr. McBride intended to provide the methamphetamine to "Pauline Niner," who turned out to be a fictitious social media persona created as part of a sting operation by the Whitman County Sheriff's Office.

Mr. McBride contends he should have been acquitted on the basis of his defense of entrapment and, for the first time on appeal, that the conduct of law enforcement was outrageous, in violation of his right to due process. He fails to make the required

---

* Judge Laurel H. Siddoway was a member of the Court of Appeals at the time argument was held on this matter. She is now serving as a judge pro tempore of the court pursuant to RCW 2.06.150.

showings, however.  For that reason and because he presents no meritorious issues in his

pro se statement of additional grounds, we affirm.

FACTS AND PROCEDURAL BACKGROUND

During Sergeant (Sgt.) Michael Jordan's employment by the Whitman County

Sheriff's Office, he has attended a number of training programs focused on drug and

street-level crimes.  As of 2022, the most recent training he had attended dealt with how

drug dealers and users are increasingly communicating through social media and how

officers can create a profile and participate in social media communication as a way of

interdicting drug dealing.

In January 2022, Sgt. Jordan relied on his recent training to create a Facebook

profile for "Pauline Niner," for the purpose of meeting people online who are willing to

sell drugs.  "Pauline's" Facebook profile characterized her as a woman living in Pullman.

At Mr. McBride's trial, the sergeant explained that he set up a female profile because

"[i]t attracts more people.  More—more guys are out looking for girls and girls are—

looking to—more guys sell drugs than girls."  Rep. of Proc. (RP) at 117.

In 12 days' communications that took place over two and one-half weeks in early

2022, Mr. McBride contacted "Pauline" and the two discussed meeting up.  "Pauline"

wanted to procure methamphetamine and Mr. McBride said he could obtain some for her.

Problems with Mr. McBride's vehicle, his suppliers, and his cash flow proved to be

obstacles to his attempts to provide her with methamphetamine on February 9 and 10,

and again on the evening of February 15, but on February 16 he informed "Pauline" he had a "little bit" to bring to her. Ex. 101, at 28. Present to meet him when he arrived at "Pauline's" address was Sgt. Jordan, who arrested him.

Mr. McBride was charged with possession of a controlled substance (methamphetamine) with intent to deliver. At trial, he asserted the defense of entrapment. His lawyer likened Sgt. Jordan's sting to a Cold War, KGB[1] "honey trap": using fictitious females to seduce men into doing something wrong. Defense counsel also argued that on the day of his arrest, Mr. McBride had merely intended to share the small amount of methamphetamine in his possession with "Pauline," which was not the statutorily-required "delivery."

The only witnesses called in the State's case were Sgt. Jordan and a witness from the Washington State Patrol Crime Laboratory. The crime lab witness had tested the substance seized from Mr. McBride and testified that it was 0.4 grams of crystalline material that contained methamphetamine. Mr. McBride did not testify.

The most critical evidence at trial was exhibit 101, a complete collection of screenshots that Sgt. Jordan had taken of "Pauline's" and Mr. McBride's communications

---

[1] The transcript of closing argument reports counsel as saying KJB, but in context it is clear he must have said KGB, the acronym for "Komitet Gosudarstvennoy Bezopasnosti," according to the *Encyclopedia Brittanica.* (Available at https://www.britannica.com/topic/KGB). According to the encyclopedia, the KGB (in English, "Committee for State Security") was a security agency of the Soviet Union established in 1954.

No. 38872-7-III
*State v. McBride*

on Facebook Messenger. Apart from that, the two had only had one brief telephone conversation.[2]

In the briefing on appeal, Mr. McBride emphasizes communications from "Pauline" that he contends were repeated inducement, while the State emphasizes communications that it contends belie any reluctance on Mr. McBride's part to provide "Pauline" with methamphetamine. The communications themselves best illustrate Mr. McBride's point that "Pauline" was playfully offering to "party" with him as much as to buy drugs, and the State's point that the two-and-one-half-week delay in an actual delivery of drugs was more attributable to mishaps befalling Mr. McBride than any reluctance on his part to sell drugs. We therefore reproduce the communications.

Mr. McBride's communications are on the left and "Pauline's" are on the right. The extensive shorthand, misspellings, and run-on words are from the original. Early in the communications, the slang terms "white christmas," and "Clr" (short for "clear") are used, both of which Sgt. Jordan testified refer to methamphetamine:

---

[2] Sgt. Jordan did not testify about the content of the call, but it is reflected on the Facebook Messenger screen shots as having taken place at 10:46 a.m. on February 9. The immediately preceding messages suggest the parties were confirming "Pauline's" interest in 2 ounces of methamphetamine estimated to cost $400. No explanation was provided whether Sgt. Jordan participated himself in the call and, if so, how he passed himself off as female.

4

JAN 30, 4:31 PM

Hi paulie whats up in pullman

JAN 31, 9:35 PM

Just new to the area tryn to meet new peeps.
Pullman seems cool tho.

FEB 04, 12:22 AM

Yes m n spokane

FEB 04, 12:38 AM

Nice. Do you like Spokane

FEB 04, 6:01 AM

Its ok but latly with all the hpmeless its
getting kinda ttashy but its ok
What do you like to do walk or hike
bike beaches bars cars laying
together watching stars

FEB 07, 4:06 PM

Mainly party lol

FEB 07, 7:41 PM

Cool thats mainly what i do you like to drink
smoke gfssn or do youblike the white christmas

I like a little Clr

Yep my choice. Also

Well Pullman is dry af

FEB 08, 6:01 PM

Hey there

It is i dont know anyone to sell to i
can get as much as i want

FEB 08, 6:46 PM

Can you hook me up?

FEB 08, 8:17 PM

Im sure i could but i just got a motor home
so im out on the rez at the moment

FEB 08, 8:43 PM

What ate you looking for

FEB 08, 9:22 PM

Oz

FEB 09, 8:05 AM

Sry was just an idea

FEB 09, 9:26 AM

Ok they run 400 hundredish do you have a number so we dont have to be on messenger to talk ot we could meet and talk maybe we can work out an arrangment that works for both of us ?

FEB 09, 10:33 AM

Can I call you on here?

FEB 09, 10:46 AM
Audio Call
1 min

Sry my WiFi sux
I got paid today. Planning any trips to Pullman?

FEB 09, 11:34 AM

I could this evening if thst would work for you what was you thinking how much

I think 2. My girl getting paid tonight too

Ok Im going to spokane in a few hrs i will call you befor i leave town to come see you so i know what to bring and when we meet i would like to talk to you about a maybe working together

Sweet what time you thinking about coming down? Just want to make sure my girl gets me the money by then

Im not sure exactly but before it gets to late Yep that would be cool i will give you a heads up so you will have a little time to get it set up ok

FEB 09, 12:17 PM

We good
[Photo of fingers holding currency, $100 and $20 bills visible]

Yep

FEB 09, 12:39 AM

[Thumb up emoji]

FEB 09, 3:58 PM

We're you able to get me 2

I'm headed to Spokane right now since I get there I'll check on it and I'll let you know right away

Thanks are you gonna party with me tonight

6

FEB 09, 5:42 PM

I hope so

K I can order a pizza or something?

Allright. Im working on my suburban got some
bad gas i will get it together n get thare

Oh no that sounds bad!

No i will get it going

FEB 09, 6:38 PM

Im working on the other for you im sure
it will be there when i dp

K I'm hurting lol

I will get you something ok

I'm sorry about ur car

Oh its no big deal i work on cars all the time.
I will get it going

Nice! Maybe you could look at my
car sometime haha

What kind ofcar do you have

A Honda ... I forget what year. Like 02 maybe

I like hondas what do you think is wrong
with it what did it do befor it died

It runs fine but shakes bad when
I'm on the highway

FEB 09, 7:18 PM

Thats easy i would say you have a tire out of
balance im sure i could figure thst out

Oh is that serious

No. I will check it out get it working right thats
what i do when im not doing my reg job

Please don't feel like you have to but
I really appreciate it [Smiley face emoji]

No problem i like to doit. It gets me brownie
points i hope lol

How has no girl scooped you up

Some try to but im hard to tye down

Haha

But its fun trying lol

FEB 09, 8:41 PM

How's it going

7

FEB 09, 9:54 PM

Just got my suburbon started and running
Im headed tp spplane in a vouple min it takes
about 45 min to get thete

You must be freezing

No im ok its not too cold

I got 8 bills

Ok let me get to town and i will let you know how
much i can get so just hang with me

K please don't burn me

Not even i will get ypu a good deal and im
wanting to do something with you i will talk to you
about ut more when i see you if your interested

Ya I'm interested. Just need help
getting started

Ok we will talk i will text you in a little while
watch for me k

[Smiley face emoji]

FEB 10, 12:01 AM

You still there

Im in spokane now working on getting it for you
would you be willing to come to spokane i could
come down n pick you up anf we could come up here
n pick it up my regular dude is out of town but I can
still hook up but i woulf have to have cash so you
would have to be with me

Idk kinda makes me nervous

I understanfi dont want that i dont like drams um
i kinda feel the same way i just know that i wouldnt let
my money go i just dont have that much cash on hand
at the moment but i was hoping we could do something
thats why was wanting to get something going in other
plaa es to exspand a little and make a little extra

Ok so I guess it's not
gonna happen [Disappointed emoji]

Dont give up yet it can happen just have to figure out
how to get it. To get it too you im tryi g a couple other
people trying to get someone to let me run with them

I understand yo have been super cool
I'm just really hurting  It doesn't have
to be 2 we could do 1 and if my car
is working better I could meet you
for another 1 later

Ok im working on something. Now my homegirls
person is there anf she is trying to do something so
give me a couple min to ser it up k

K

FEB 10, 12:53 AM

Ok i know you want a oz but you said you was
hurting  i got a ball that i could bring you if you want
to check it out that way we can. Meet and go from there
its 60 and if you smoke with me i wont make anything
but im hoping that it makes me some down the rd if you
know what i mean

Sure that sound good
I know you really tried and this will be a
great way to meet and go from there

Thats what i was thinking. If you reallywant more
we can do more tomorrow or something like that

[Smiley face emoji]

Now i just got to get some gas

FEB 10, 1:21 AM

Ok
U on your way?

FEB 10, 4:03 AM

Allmost im on my way to get it now I

FEB 10, 4:28 AM

Im low on gas so im ttot trying to run out
i got it and headed your eay

FEB 10, 5:21 AM

Hello is 5here any way ypu could meet me
half way

FEB 10, 6:11 AM

I thought u wanted to party

FEB 10, 7:18 AM

I do i have the ball but i can get the rest if
you want it i didnt have enough gas last night j
wad going to go any way but then i lost you fora
mii. So do you still wanna party wuth me We can
figure this out if we hook up right

9

FEB 10, 8:26 AM

Do you still want me to come down

FEB 10, 9:02 AM

Yes plea's sorry I fell asleep waiting

.i know my fault ok i got a couple little things to do
then im on my way we will get this worked out k

Are you sure lol

FEB 10, 9:28 AM

Im sure lol

Ok what time seriously

2hrs or by nooj

Ok are you cool if my homegirl is here too.
She's legit. If not I can get rid of her

FEB 10, 10:02 AM

She can be there if you want her but it would
be nice to be able to talk. Alone so maybe she could
give us a couple hrs. To talk after i get there what you thinl

For sure

We can smoke or whtever you like first

Ya that would be nice. Did you get the 2

FEB 10, 10:45 AM

←William replied to you
Ya that would be nice. Did you get the 2
lgot themon hold i. need cash to be able to get thr

FEB 10, 11:39 AM

Have them roll with you Listen I'm hurting
I'm gonna have to figure out another way.
Thanks for trying

FEB 10, 12:16 PM

Im in oakesdale now if you could meet me i have
some to get ypu high with you could check it out if
you like it we could go grab whatever you want

So your not coming to Pullman

FEB 10, 12:45 PM

I will but i only got a little enough for you to try
to get better but i need the cash to get the two they
are waiting for me to come grt them

Ok well my car is fucked off

FEB 10, 1:11 PM

I just found a little. Hit me up
sometime when you have some.

FEB 10, 1:53 PM

I will get some n bring we are still going.
To party right

Maybe next week. I'm set up for
the next few days

FEB 10, 2:49 PM

Ok if thats. Good for you hit me up if you eant to

Prob Monday or Tues. will you be able
to meet up then? Understand you can't
really promise to get me set up. But
don't want end up empty last min

I here you my norm person is out of town so tjats
why this i just shelled out money for motor home
and going to get it and it kinda drained my pockets
sprry this other person dont do fronts so. A sure i
would like to mrrt you and get a to know you a little
and i would still lookat your car fir you i think i could
fix it for you pretty chea
Cheap

FEB 11, 11:15 AM

Hi there

FEB 11, 12:21 PM

.Hey whats up

Not much. How are you

Im good im glad your feeling better

FEB 11, 12:55 PM

What are you doing today

FEB 11, 1:41 PM

Just cleaning house lol What are u doing

FEB 11, 8:12 PM

Have a good night
["Rock on" emoji]

FEB 11, 11:52 PM

You too maybe we will get a chance to
kick it some nighy

FEB 12, 4:41 PM

Hello how are you today

FEB 14, 10:53 AM

What's up

FEB 14, 4:16 PM

Happy Valentine's Day

11

FEB 14, 5:17 PM

Happy valentines day to you
[Smiley heart eyes emoji and heart emoji]

What you doing

Nothing much finishing my motor home
heading back to spokane soon
What are you doing

I'm so bored

Sorry wish i was there to entertain you

Me too

We will have to set up a time for me to come
visut you

What's a good time for you

Well i would say any time but im way out of
town now soon though would ve awsome

Sounds good..l'm not doing anything

Ok i will let you know as soon as i can

Cool

FEB 14, 6:18 PM

Did you get your motor home fixed?

Im working on it got the tranny out now just
gotta change the flywheel. And put it. Ack un

Oh that sounds like a big job

Back in  Nit too bad

FEB 14, 7:26 PM

Did you go to school to learn how to fix cars?

FEB 15, 11:28 AM

Hi

FEB 15, 12:24 PM

Hi and moost of myeducationigot hands on

That's the best kind

For sure i like hands on withveverything i do ha ha

[Smiley face emoji]

How about you would you like some hands on eclwrience
Exspeeance
Well looks like i need a typing classs lmao
Would like to get with you and kick it
i think rhat would be fun

Well let's figure out when you can
make a trip down here then

For dure would like to do it soon i jave togo back
down to oregon soon but i want to meet and hook
up with you befor that happens

I got cash and don't have plans tonight

Ok let me see if i can make it there tonightf

I'm excited

Me too i cant wait to see you I will get there as early
as possible so thay. Ee have lots of toime

[Heart emoji]
And are you able to bring 2?
[Fingers crossed emoji]

I will see whats up for surr

K. Hopefully you can make it happen.
I gotta get back to work. I'm off at 4.

Pk i will work on it ok
[Thumb up emoji]

[Winking face with tongue emoji]

FEB 15, 4:15 PM

Hello

FEB 15, 6:30 PM

You partying tonight?

FEB 16, 8:24 AM

Sorry

It's fine

FEB 16, 10:49 AM

What happened

FEB 16, 12:26 PM

I hada flat tire and no spare and so i had to chang
them all so it took awhile and i didnt have what you
wanted we need to talk and if i could get you ti comme to
spokane or i could come and you could ride with mr

Ok
Well my car is messed up
still so I'm stuck here

So what do you think about going pn a little road trip
withvme I got all nrw ntires now

Anytime

FEB 16, 1:37 PM

What's your plan...if any

13

FEB 16, 4:23 PM

Pk

?

FEB 16, 6:06 PM

Okay so I'm headed your way you still want
to do this right

Yes

FEB 16, 6:45 PM

O hope so cause i am on the bad guy list
Will you be anle to p Greet me a little gas gss

Of course silly. Do you have a little shit
to help me stay awake?

FEB 16, 7:11 PM

I ewill get a litttle

Sweet

Im in oakeddale now and i will be lrsving soon
Hey I'm driving now I'm just leaving Oakdale so
maybe 40 45 minutes I'll be there you'll have to
send me your address or something  Then I got
a little bit dumpling for you hopefully that'll work it
gives out there and I'll jump into the guy when I
get there all right

Ok let me know when you are close

[Thumb up emoji]

FEB 16, 7:40 PM

They mean from those 14
miles away

Huh
Are you close?

Im at dismores where do I go
[Thumb up emoji]

1155 SE Bypass dr

Im on tpwn
Ok

Go to the back of parking lot and you can
park by a shed there. Let me know when
you are here and I can meet you outside
[Open smile face emoji]

Ex. 101, at 1-29 (duplicated messages omitted).

The address provided by "Pauline" was that of an apartment complex. On Mr. McBride's arrival, Sgt. Jordan placed him under arrest and searched him, recovering methamphetamine in his left front pocket and a broken methamphetamine pipe in his sweatshirt pocket. He informed Mr. McBride that he was "Pauline." Mr. McBride protested that he brought the meth to share with "Pauline," not to sell it.

The jury returned a guilty verdict. Defense counsel later stated at sentencing that it had taken the jurors almost two and one-half hours to return the guilty verdict on a single count, which suggested they were troubled by the issues of entrapment and whether there had been a delivery. He asked for a sentence at the bottom of the range, but the court imposed a midrange sentence of 90 months total confinement, with 12 months of community custody. Mr. McBride appeals.

ANALYSIS

Mr. McBride challenges the sufficiency of the evidence to support the jury's verdict on two theories: he contends (1) that no rational juror could have found that he failed to prove the defense of entrapment, and (2) for the first time on appeal, that the conduct of law enforcement was outrageous, in violation of his right to due process.

I. THE EVIDENCE WAS SUFFICIENT TO PRESENT A JURY QUESTION ON THE ENTRAPMENT DEFENSE

Washington courts have long recognized the existence of the common law defense of entrapment. *State v. Arbogast*, 15 Wn. App. 2d 851, 868-69, 478 P.3d 115 (2020)

15

(*Arbogast* I) (quoting *State v. Lively*, 130 Wn.2d 1, 9, 921 P.2d 1035 (1996)), *aff'd*, 199 Wn.2d 356, 506 P.3d 1238 (2022) (*Arbogast* II).  In 1975, the legislature codified the common law definition of entrapment.  *Id.*  RCW 9A.16.070 provides:

> (1) In any prosecution for a crime, it is a defense that:
>
> (a) The criminal design originated in the mind of law enforcement officials, or any person acting under their direction, and
>
> (b) The actor was lured or induced to commit a crime which the actor had not otherwise intended to commit.
>
> (2) The defense of entrapment is not established by a showing only that law enforcement officials merely afforded the actor an opportunity to commit a crime.

"The statute restates the subjective test of entrapment applied by federal and Washington state courts, which focuses on the issue of whether the defendant was predisposed to commit the crime rather than on the conduct of the State to induce or entice the defendant."  *Id.* (citing *Lively*, 130 Wn.2d at 10 & n.2 (citing *Sorrells v. United States*, 287 U.S. 435, 451, 53 S. Ct. 210, 77 L. Ed. 413 (1932); *State v. Waggoner*, 80 Wn.2d 7, 10, 490 P.2d 1308 (1971)).

The Washington Supreme Court has held that RCW 9A.16.070(1)(b) requires proof that the defendant "'was tricked or induced into committing the crime by acts of trickery by law enforcement agents,'" and "'[s]econd, . . . that he would not otherwise have committed the crime.'"  *Lively*, 130 Wn.2d at 10 (quoting *State v. Smith*, 101 Wn.2d 36, 43, 677 P.2d 100 (1984)).  The court also held in *Lively* that the burden of proving the defense of entrapment is borne by the defendant.  It is like other affirmative defenses that

are uniquely within the defendant's knowledge and ability to establish, since the predisposition of the defendant to commit the crime "is the focal element of the defense." *Id.* at 13. This distinguishes Washington's law of entrapment from federal common law and the law of many states, which require the government to disprove entrapment beyond a reasonable doubt. *Id.* at 12-13 & n.3.

Given Washington's allocation of the burden of proof, when entrapment was asserted and evidence sufficiency is challenged, we review the evidence in the light most favorable to the State and determine whether a rational trier of fact could have found that the defendant failed to prove entrapment by a preponderance of the evidence. *Id.* at 17. "'The preponderance of the evidence standard requires that the evidence establish the proposition at issue is more probably true than not true.'" *State v. Arredondo*, 188 Wn.2d 244, 257, 394 P.3d 348 (2017).

In any case involving a law enforcement sting operation, the evidence may well support a finding that the criminal design originated in the mind of law enforcement officials. As in this case, the outcome is more likely to turn on whether the defendant proves that he was "lured" or "induced" to commit a crime or whether law enforcement did no more than afford the defendant an opportunity to commit a crime.

"Inducement evidence may be based on persuasion, fraudulent representations, threats, coercion, harassment, promises of reward, pleas based on need, and sympathy or friendship." *Arbogast* II, 199 Wn.2d at 375. "There must be opportunity 'plus'

17

something else, such as excessive pressure placed on the defendant." *Id.* at 377. In

*Arbogast* I and II, which involved a Washington State Patrol Internet sting operation

targeting child predators, a fictitious mother implied that she might get sexually involved

with the defendant if he first had sexual sessions with her children. The trial court

viewed that enticement as only a "'normal amount of persuasion.'" *Id.* at 375. Our

Supreme Court agreed that it *might* be only a normal amount of persuasion, but held,

"[T]hat is a jury question." *Id.* The trial court's error in *Arbogast* was to refuse to even

instruct the jury on the entrapment defense. Here, the jury was instructed on the defense,

but found it was not proved.

The jury had a sufficient basis for concluding that Mr. McBride was not tricked

into committing a crime he would not otherwise have committed. Early in his

communications with "Pauline," Mr. McBride said not only that he could get as much

methamphetamine as he wanted but "don[']t know anyone to sell to"; he also suggested

that she and he embark on a joint enterprise. *See* Ex. 101, at 3 (speaking of "work[ing]

out an arrangment [sic] that works for both of us," *id.* at 4, talking about "maybe working

together," *id.* at 5, and stating, "im [sic] wanting to do something with you . . . if your

[sic] interested," *id.* at 10). At least two attempts by Mr. McBride to acquire

methamphetamine for resale to "Pauline" failed not because of any reluctance on his part

but because people were out of town, or he was cash-strapped, or he had car trouble. At

no point in their communications did he express any *reservation* about selling drugs to her.

Substantial evidence supported the jury's verdict.

II.     OUTRAGEOUS GOVERNMENT CONDUCT IS NOT SHOWN

For the first time on appeal, Mr. McBride contends that the conduct of Sgt. Jordan was so outrageous that it violated his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution.  If manifest, the constitutional error may be raised for the first time on appeal.  RAP 2.5(a)(3); *Lively*, 130 Wn.2d at 19.

A claim of outrageous government conduct "is founded on the principle that the conduct of law enforcement officers and informants may be 'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'"  *Lively*, 130 Wn.2d at 19 (quoting *United States v. Russell*, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973)).  "For the police conduct to violate due process, the conduct must shock the universal sense of fairness," a matter that presents a question of law for the court.  *Id.*  Courts evaluate the government's actions under the totality of circumstances.  *Id.* at 21.

*Lively* identifies the following factors for determining whether police conduct was outrageous:

> [(1)] whether the police conduct instigated a crime or merely infiltrated ongoing criminal activity; [(2)] whether the defendant's reluctance to commit a crime was overcome by pleas of sympathy, promises of excessive profits, or persistent solicitation; [(3)] whether the government controls the criminal activity or simply allows for the criminal activity to occur; [(4)] whether the police motive was to prevent crime or protect the public; and [(5)] whether the government conduct itself amounted to criminal activity or conduct "repugnant to a sense of justice."

*Id.* at 22 (citations omitted).

When dealing with drug-related crimes, courts recognize that it is particularly necessary to allow for the use of aggressive law enforcement mechanisms, such as using paid informants or providing contraband or other necessary items to further the criminal activity. *Id.* But Mr. McBride compares his case to *United States v. Twigg*, in which the Third Circuit Court of Appeals held the government went too far when it spent months encouraging and assisting the defendant to set up a methamphetamine laboratory. 588 F.2d 373 (3d Cir. 1978). The direct and continuous government involvement over a long period of time was deemed too outrageous to allow for prosecution. *Id.* at 379.

"Pauline" offered Mr. McBride no assistance in setting up a criminal enterprise. He relied on his own contacts and resources in his efforts to procure and provide her with methamphetamine. Mr. McBride never expressed resistance or reluctance to obtaining methamphetamine for her. The only control that can be said to have been exercised by Sgt. Jordan was balking when Mr. McBride suggested a delivery taking place in Spokane, which was outside Sgt. Jordan's jurisdiction.

Mr. McBride repeatedly failed to deliver the amount of methamphetamine "Pauline" was seeking, at the times she was seeking it. The amount and timing of the eventual delivery was controlled by Mr. McBride. Mr. McBride implies on appeal that he was targeted by Sgt. Jordan, but he presented no such evidence and any evidence that he *was* a known or suspected drug dealer would cut against him in the due process analysis. At most, Mr. McBride can point to only the fact that he was arrested in a law enforcement sting operation, in which he failed to prove entrapment. This falls well short of outrageous government conduct.

## STATEMENT OF ADDITIONAL GROUNDS

In an original and supplemental pro se statement of additional grounds (SAG), Mr. McBride identifies what we discern to be five additional grounds for review. He includes an "affidavit of facts," but in a direct appeal, allegations of error must be based on the record on review. *See* RAP 9.1(a).

*SAG 1, 3: Ineffective Assistance of Counsel*

Mr. McBride alleges that his trial lawyer provided ineffective assistance by (1) not moving at trial for dismissal of the charge for insufficient evidence, (2) "failure to investigate probable cause to investigate," SAG at 1, and (3) failing to provide Mr. McBride with discovery.

21

The Washington and United States Constitutions guarantee a criminal defendant the right to effective assistance of counsel. WASH. CONST. art. I, § 22; U.S. CONST. amend. XIV, § 1; *see also State v. Sardinia*, 42 Wn. App. 533, 538, 713 P.2d 122 (1986). To demonstrate ineffective assistance, a defendant must show that (1) defense counsel's representation was deficient, and (2) defense counsel's deficient representation prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). When alleging ineffective assistance based on defense counsel's failure to make a motion, the defendant must show that "the trial court likely would have granted the motion if made." *State v. McFarland*, 127 Wn.2d 322, 334, 899 P.2d 1251 (1995).

Mr. McBride offers no explanation why he believes a motion to dismiss for insufficient evidence would have been granted. We have already rejected appellate counsel's sufficiency challenge, so the contention merits no further consideration. *See* RAP 10.10(c) (SAG must inform the court of the nature and occurrence of alleged errors).

The second and third allegations of ineffective assistance depend on facts outside the record and must be considered, if at all, in a personal restraint petition. *State v. Norman*, 61 Wn. App. 16, 27-28, 808 P.2d 1159 (1991).

*SAG 2: Trial Court Failure to Instruct the Jury*

Mr. McBride alleges that the trial court's jury instructions failed to explain guilt beyond a reasonable doubt, failed to explain entrapment, and failed to instruct on a lesser charge when the evidence did not support the crime with which he was charged. While we note that the first two concepts were addressed by the instructions and an instruction on a lesser charge is required only when an identifiable lesser crime was arguably committed, it is sufficient to point out that these objections were unpreserved at the time the trial court entertained objections and exceptions.

*SAG 4: Evidentiary Error Regarding Phone Call*

Mr. McBride contends the trial court erred by allowing Sgt. Jordan to testify about the occurrence of a phone call between the sergeant and himself because there was no recording of such a call, no such call ever took place, and the sergeant's testimony was hearsay. The defense made no objection to the testimony, which was only that a call occurred, not what was said. If there was any basis for an objection, error is unpreserved. RAP 2.5(a).

*SAG 4: Prosecutorial Misconduct*

Mr. McBride labels his next ground as "prosecutorial misconduct," but in substance this is another challenge to the sufficiency of the evidence and specifically whether there was evidence supporting an intent to deliver. Mr. McBride relies on cases in which there is no evidence of delivery or a planned delivery to an identified person,

but only evidence of drug possession and other evidence (scales, ledgers, cash, packaging materials) supporting an inference that the defendant is in the business of delivering drugs. In this case, there was evidence of a planned delivery to "Pauline." The cases on which Mr. McBride relies are inapposite.

*SAG 5: Pretextual Arrest*

Mr. McBride asserts that he was first stopped in the Pullman apartment complex parking lot by a deputy other than Sgt. Jordan, who pointed out that he had a taillight out and suspected him of driving with a suspended license. He claims that this was a pretextual stop, and only developed into the search and arrest by Sgt. Jordan.

Whether there was a basis for a challenge to the stop and whether it was preserved cannot be determined from our record. It must be considered, if at all, in a personal restraint petition. *Norman*, 61 Wn. App. at 27-28.

No. 38872-7-III
*State v. McBride*

      Affirmed.

      A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Siddoway, J.P.T.

WE CONCUR:

_____
Pennell, J.

_____
Staab, J.